**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-12916

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

LATONA MAE LAMBERT,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 5:22-cr-00053-CAR-CHW-3

————————————

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and BRASHER, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether sufficient evidence supports the conviction of a daycare director for failing to report suspected child abuse. *See* 18 U.S.C. § 2258. Two teachers in

a daycare classroom on Robins Air Force Base abused the toddlers under their care for months. Several workers, including the abusers, told the director, Latona Lambert, that things were not going well inside the classroom. One worker told Lambert that the abusers cursed the children with obscene language and played rap music with profane lyrics, and that worker refused to return to the classroom because she feared what would happen. Lambert had access to a video monitor of the classroom, which captured much of the abuse, and she regularly used the monitors to discipline employees. A jury convicted Lambert of failing to report the abuse. Because Lambert had reason to suspect the abusers were subjecting children to mental injury, we affirm her conviction.

## I. BACKGROUND

Robins Air Force Base, located in Warner Robins, Georgia, operates two childcare facilities for children of servicemen and on-base civilians. These two facilities are known as the Child Development Centers East and West. Latona Lambert was the Director of the Child Development Center West. The West classrooms were segregated by age. It had four rooms for toddler care, named sequentially Toddler One, Toddler Two, and so on.

As Director, Lambert was "responsible . . . for the entire operation of the facility." She was to "overs[ee]" the "staff," "children," "financials," and maintenance. To aid her in that task, she could access all of West's cameras on a monitor in her office. Each classroom had two cameras, both of which created a live video dis-

played continuously on monitors throughout the facility. Lambert's monitor sat on a second desk adjacent to her main desk. The monitor could show multiple videos at once, but Lambert could select a single video to view. She could also use the system to "rewind" to view recorded footage from the last 30 days and to enlarge portions of the footage. Lambert used this system to monitor and discipline employees for minor infractions.

Two employees, Zhanay Kiana Flynn and Antanesha Fritz, took over the Toddler One classroom in late 2020. Flynn and Fritz did not get along, and both repeatedly sought transfer to another classroom. Fritz made "[m]ore than five" transfer requests, and Flynn talked to Lambert "eight to ten times" about the negative environment in Toddler One.

Sometime between October and December 2020, Flynn and Fritz began abusing the children in their care. Flynn attributed this behavior to the fact that she was "going through a lot in [her] personal life mentally." Fritz blamed "the drama outside of the classroom."

Captured on video were numerous incidents where Flynn and Fritz "sprayed" children "in the face with spray bottles" of cleaning solution, "encouraged or guided" children "into fighting each other or hitting each other," and "hit" children "over the head with books." They also grabbed the toddlers' wrists and "us[ed] the children's hands, closed fists, to hit other children in the face." At other times, they "dragged" children across the room and placed them in cubbies, which were not supposed to be used for discipline.

The children also sometimes withdrew and sat in the cubbies on their own. The prosecution compiled "close to 100" incidents of such abuse into a "90-minute supercut video" it played for the jury.

Early in 2021, Bretta Goins, another daycare employee, visited Lambert to express her concerns about how Flynn and Fritz were treating the children in their classroom. Goins was a "floater" who worked in multiple rooms as needed, including Toddler One. She told Lambert that she "wasn't comfortable with" some things Flynn and Fritz did. On multiple occasions she heard them playing "rap" music with "profanity." She also heard them cursing at children—telling them to "[s]it your ass down," "[b]ring your ass over here," or saying "[y]ou're getting on my fucking nerves." She told Lambert that Fritz and Flynn were not being "nice" to the children, and she refused to go back into their classroom though it meant going home unpaid. She also said that she was "scared that something was going to happen," and "didn't want to be at fault for it." Goins again brought up her concerns about Fritz and Flynn at a staff meeting after she made her initial report. Lambert disclaimed any knowledge of her concerns.

In January, Saengkul Teague started working in Toddler One. She observed Fritz and Flynn using "foul language" around the children, "shaming a child for having an accident," and "throwing toys." She reported those incidents to Lambert on or before February 19, 2021. Lambert "acknowledged the situation" and contacted the Family Advocacy Office, which opened an investigation later transferred to the Air Force Security Forces.

On October 11, 2022, a grand jury indicted Fritz and Flynn for more than two dozen counts of cruelty to children and battery. The grand jury also indicted Lambert for failing to report suspected child abuse. *See* 18 U.S.C. § 2258. Fritz and Flynn pleaded guilty to cruelty to children in the second degree in May 2023, and the prosecution filed a superseding indictment adding that Lambert was an accessory after the fact to Fritz and Flynn's abuse, *see id.* § 3, and that she made false statements to a federal official, *see id.* § 1001.

A jury acquitted Lambert of accessory after the fact and making false statements but found her guilty of failure to report child abuse. The district court sentenced Lambert to two years of probation, with the possibility of early termination.

We appointed Scott Ballenger of the University of Virginia School of Law's Appellate Litigation Clinic as appellate counsel for Lambert. Lance J. Ledet, Jr. and Alex E. Webb presented oral argument. We thank Mr. Ballenger, Mr. Ledet, Mr. Webb, and the clinic for accepting the appointment and for their excellent representation.

## II. STANDARD OF REVIEW

We review challenges to the "sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict." *United States v. Kincherlow*, 88 F.4th 897, 902 (11th Cir. 2023) (citation modified).

## III. DISCUSSION

In 1990, Congress enacted the Victims of Child Abuse Act. Pub. L. No. 101-647, Title II, 104 Stat. 4792. We are the first circuit court to interpret the provision that requires certain people working in federal facilities, known as mandatory reporters, to make "a timely report" should they "learn[] of facts that give reason to suspect that a child has suffered an incident of child abuse." *Id.* § 226(b), (g), 104 Stat. at 4806, 4808 (codified at 18 U.S.C. § 2258 and 34 U.S.C. § 20341(b)). The Act separates "child abuse" into several categories, including "physical injury" and "mental injury." *See id.* § 226(c)(1)–(3), 104 Stat. at 4806 (codified at 34 U.S.C. § 20341(c)(1)–(3)).

Section 2258 does not place a heavy burden of proof on the prosecution. A mandatory reporter must report any time he or she has a "reason to suspect" a child has suffered abuse. "Suspect" means "[t]o have a slight or even vague idea concerning;—not necessarily involving knowledge or belief or likelihood." *Suspect*, BLACK'S LAW DICTIONARY (6th ed. 1990). So a reporter must act when he or she has reason to think child abuse *might* have taken place.

Lambert does not dispute that she was a mandatory reporter or that she did not report Fritz and Flynn until her conversation with Teague. Instead, she argues that the prosecution did not present sufficient evidence that she should have suspected that Fritz and Flynn had engaged in child abuse. We reject her challenge.

We must affirm a jury's conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). That standard resolves this appeal. A reasonable jury could have inferred that Lambert had reason to suspect the children in Toddler One had suffered "mental injury."

The statute defines "mental injury" as "harm to a child's psychological or intellectual functioning." 34 U.S.C. § 20341(c)(3). And it offers examples of ways this harm might manifest. A child might experience "severe anxiety, depression, withdrawal or outward aggressive behavior, or a combination of those behaviors." *Id*. A reporter might identify these behaviors through "a change in behavior, emotional response or cognition." *Id*. But these examples are illustrative, not denotative. A child suffers mental injury whenever he experiences "harm" to his "psychological or intellectual functioning"—even if that harm does not appear as one of the listed examples.

Lambert argues that we should read this definition narrowly to reach only "severe" mental harm. But she relies for this argument on an exemplary provision of the statutory text: the list of ways harm "*may* be exhibited." *Id*. (emphasis added). Even if those examples are narrower than they first appear, they do not *define* or cabin "harm to a child's psychological or intellectual functioning." *Id*. Reading the illustrations as exclusive instead of inclusive is contrary to the statutory language. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (explaining that a list of examples

should be understood as "illustrative and not limitative" (citation modified)). So even if we agreed with Lambert's interpretations of the illustrations, they would not compel a narrow understanding of "mental injury."

Lambert's arguments to narrow the illustrative list are also unavailing. She argues that all the examples of mental injury given in the statute are "severe mental condition[s]." It is true that the statute requires "anxiety" to be severe. But to make "depression" "severe," she points to a modern clinical definition. We doubt that the statute employs "depression" or "anxiety" in their clinical senses—after all, "withdrawal" and "outward aggressive behavior" were not freestanding diagnoses in 1990. The then-current edition of the Diagnostic and Statistical Manual of Mental Disorders listed neither as diagnoses outside the substance-abuse context. *See* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 555–67 (3d ed. rev. 1987). Nor does either appear in its index of symptoms. *See id.* at 524–52. So we interpret both "severe anxiety" and "depression" in their colloquial senses. The latter carries the meaning of general dejection or dispiritedness. *See Depression*, WEBSTER'S THIRD NEW INT'L DICTIONARY 606 (1993). Children sometimes become sad or anxious, but a reasonable person would not suspect "mental injury" unless bouts of either emotion are more than occasional. A reasonable person would infer mental injury from sadness or anxiety only if he or she saw a systematic "change in behavior, emotional response or cognition." 34 U.S.C. § 20341(c)(3).

24-12916               Opinion of the Court                    9

Lambert argues that the series-qualifier canon requires that we apply the adjective "severe" to every item that follows it. So not only "severe anxiety," but also "severe depression," "severe withdrawal," and so on. But the series-qualifier canon applies when a statute employs a "straightforward, parallel construction." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts § 19, at 147 (2012). And this statutory list is not parallel. To a list of nouns—"anxiety, depression, withdrawal"—it adds a phrase—"outward aggressive behavior," and it then appends "a combination of those behaviors" at the end. In this statutory context, the nearest-reasonable-referent canon applies. *See id*. § 20, at 152. Here "severe" modifies only "anxiety."

Lambert also argues that the canon of constitutional avoidance supports her reading because any less stringent reading would be void for vagueness. We disagree. The definition of "mental injury" gives a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *See SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022) (citation modified). Indeed, a reading of "mental injury" that limits injuries to a degree of severity is *less* clear than one requiring only harm. After all, the boundary between an injury and non-injury is clearer than that between a severe and non-severe injury. The canon of constitutional avoidance does not apply here.

Lambert also questions whether the prosecution proceeded under a "mental injury" theory. But in closing argument, the prosecution told the jury that child abuse "can be physical or mental

injury," and mentioned specific "[c]hanges in behavior" that it argued signaled "psychological harm." And the district court instructed the jury about the definition of "mental injury." Although the prosecution focused more on physical injury, the jury could reasonably have convicted based on the mental injury theory.

Lambert had reason to suspect the children in Toddler One suffered at least mental injury. Goins reported that Fritz and Flynn played age-inappropriate music and that they demeaned the children by cursing *at* them. And Goins heightened this suspicion by expressing her fear that "something was going to happen"—a fear so stark that she refused continued employment in the classroom. A jury could infer that a reasonable person would think that childcare workers who routinely cursed at children under their care and played profane music might have caused them mental injury. Although the toddlers were unlikely to understand the obscene language, the jury could infer that the demeaning language was spoken in anger. The routine use of obscenities in anger and the routine playing of profane music evince an abusive attitude. In the light of Goins's limited exposure to Toddler One, a jury could infer that Lambert should not have assumed that Goins's fears about the danger the children faced were only prospective.

The jury also could infer that Lambert saw video footage of Fritz and Flynn harming the children under their care. She had access to video monitors of the classrooms in her office, which she regularly scoured for evidence of minor policy violations. The jury saw a video compilation of nearly 100 incidents of Fritz and Flynn

harming the children. Among other things, they "hit" the children, "dragged" them across the room, and forced them to fight each other. The video also showed the children exhibiting signs of mental injury the statute names, such as "withdrawal" and "change[s] in behavior." 34 U.S.C. § 20341(c)(3). The jury was entitled to believe that Lambert saw at least some of that footage while supervising her employees—and that seeing any of these incidents would give her a reason to suspect that children experienced "harm to [their] psychological or intellectual functioning." *Id*.

Lambert argues that the evidence is insufficient to prove she watched the footage from Toddler One because it was improbable she would have done so in the normal course of her duties. But the government paired evidence she *could* watch classroom cameras with evidence she *did*. One employee testified that she "watch[ed] the cameras" on her "plenty of times." Another testified that she "went back and watched the cameras" to show her incidents of other employees misbehaving. If Lambert actively policed employee conduct through the video monitor, a jury could reasonably infer that she saw Fritz and Flynn mistreat the children before Teague reported the abuse.

Lambert insists that it was "easier to spot the misconduct" because, in those instances, the "classrooms were largely empty" and the "classroom footage had far less movement." A jury could find otherwise; in one instance, she disciplined an employee for having "an earbud in [her] ear." That misconduct would arguably

be *harder* to spot than Fritz's and Flynn's. The jury also heard evidence that Lambert monitored the cameras during the day, while children were in their classrooms. Two employees testified that she disciplined them for daytime conduct: one for "sitting on the couch with the kids," and another for "put[ting a] child on [a] couch" without "giv[ing] the child a toy." Based on this testimony, the jury could infer that Lambert was monitoring the classroom cameras while Fritz and Flynn mistreated the children of Toddler One.

Even if we agreed with Lambert that the government provided insufficient evidence that she watched videos of the abuse before Goins's report, a jury could infer that after the report, she was "aware[] of [a] high probability" that the video would give her yet more reason to suspect abuse. *United States v. Rivera*, 944 F.2d 1563, 1570 (11th Cir. 1991) (citation modified). At that point, she could have either watched the video—and gained yet more reason to suspect abuse—or declined to do so. If she refused to watch the video because she "wishe[d] to remain in ignorance," then the jury could reasonably infer that her "deliberate ignorance" of the incidents captured on video was the equivalent of knowledge. *Id*. (citation modified). The district court instructed the jury that it could draw that inference, and Lambert never objected to the instruction, either in the district court or on appeal. So the jury could infer that no matter how she reacted to Goins's report, Lambert "learn[ed]" of the facts of mistreatment captured on video. 18 U.S.C. § 2258.

Lambert's denial at the staff meeting that Goins relayed her concerns bolsters both inferences. A jury could infer that Lambert

understood from Goins's report that she needed to investigate Toddler One. And it could infer that she denied receiving such a report *because* she was trying to cover up her failure to report. Indeed, if the jury believed Goins's testimony, Lambert's denial is difficult to reconcile with any innocent inference. So sufficient evidence supports the jury's verdict that Lambert suspected abuse but decided not to report it.

## IV. CONCLUSION

We **AFFIRM** the conviction.